# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO. 16-22991-CIV-GOODMAN
### [CONSENT CASE]

RACHEL SILER,

      Plaintiff,

v.

ABBOTT HOUSE INC., et al.,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND GRANTING ALTERNATIVE MOTION TO STRIKE RELIEF

Defendants Abbott House, Inc. and Casmat Professional Services move to dismiss Plaintiff Rachel Siler's Complaint, which raises several Fair Housing Act claims and two related tortious interference claims. [ECF Nos. 1; 16, pp. 1–14]. In the alternative, Defendants move to strike Siler's requests for injunctive and declaratory relief on any surviving claims. [ECF No. 16, pp. 14–16]. Siler filed an opposition response, and Defendants filed a reply. [ECF Nos. 18; 24]. The entire case was referred to me after the parties consented to full magistrate-judge jurisdiction. [ECF Nos. 15; 39].

The Court grants **in part and denies in part** the motion to dismiss. First, the Court **dismisses without prejudice** Count V, which raises a claim for intentional interference with a contractual relationship, because Siler has not alleged that

Defendants actually procured a breach of Siler's lease agreement. Second, the Court **dismisses without prejudice** Counts II through IV as against Casmat only because Siler fails to allege that Casmat was personally involved in the discriminatory conduct underlying those counts. The motion to dismiss is otherwise **denied**.

In addition, the Court **strikes without prejudice** Siler's requests for injunctive relief and declaratory relief. Siler's requested injunction, as phrased, is akin to asking Defendants to "obey the law," which is not a permissible form of injunctive relief. And Siler's request for declaratory relief fails to set forth an immediate and definite, rather than speculative, threat of injury.

Siler may amend the Complaint within 10 days, and, in doing so, may add any necessary allegations if she can do so in good faith and without violating Federal Rule of Civil Procedure 11. Defendants must then respond to the Amended Complaint within 14 days.

## I.     Allegations in the Complaint

Siler has spinal muscular atrophy and moves with the aid of a wheelchair. [ECF No. 1, ¶ 6]. Siler also has a service dog -- a standard poodle named Minty -- who assists her in various tasks. [ECF No. 1, ¶ 7]. Siler also schedules personal assistants to help her around her work schedule. [ECF No. 1, ¶ 31].

Siler works as an Independent Living Advocate for the Center for Independent Living of South Florida, a position she acquired in April 2016 while living in Chicago.

[ECF No. 1, ¶ 11]. When she got the job, she hired a Miami-based real estate agent and began looking for housing in Miami that would meet her needs. [ECF No. 1, ¶¶ 13–15].

Siler settled on a condominium in Miami Beach called Abbott House, which Abbott House, Inc. operates and Casmat manages. [ECF No. 1, ¶¶ 8–9, 16–17]. Siler signed a one-year lease with the owners of one of the condominium units. [ECF No. 1, ¶ 18]. As a condition of signing the lease, however, Siler had to meet with, and receive approval from, the screening committee for Abbott House's Board of Directors. [ECF No. 1, ¶ 20]. But one of the condo owners told Siler that this was just a "formality." [ECF No. 1, ¶ 21].

Before moving from Chicago, Siler spoke with Orlando Castro -- a Casmat employee who was an agent and Licensed Community Association Manager for Abbott House -- and confirmed, in writing, that she could move into her condo by a specific date. [ECF No. 1, ¶¶ 10, 22]. Based on Castro's confirmation, Siler packed her belongings into a rented moving truck, drove from Chicago to Miami, and checked into a hotel for a few days. [ECF No. 1, ¶¶ 23–24].

When Castro met Siler in person, he was surprised that she had a "condition." [ECF No. 1, ¶ 25]. Castro told Siler that the building's office was on the sixth floor, but the elevator reached only the fifth floor. [ECF No. 1, ¶ 26]. But when Siler inspected the elevator, she saw that it had a button for the sixth floor. [ECF No. 1, ¶ 27].

Siler and her personal assistant then met with two Board members about her

lease (the Complaint does not identify them by name). [ECF No. 1, ¶ 28]. Siler claims that one of the Board members asked her personal assistant "inappropriate questions regarding the nature and extent" of Siler's disability, including: "Do you live with her?", "Will you always be with her?", and "Do you sleep with her?" [ECF No. 1, ¶ 29]. Siler's personal assistant answered "no" to those questions and added that Siler could speak for herself, and Siler explained that she schedules personal assistants around her 40-hour-a-week work schedule. [ECF No. 1, ¶¶ 30–31].

The same Board member then "began to dissuade" Siler from living at Abbott House by telling her several things. [ECF No. 1, ¶ 32]. First, "that the Board of Directors did not want to be held liable if something were to happen to [Siler]." [ECF No. 1, ¶ 32(a)]. Second, "that the building only had one elevator" -- the Board member then asked Siler what she would do if the elevator stopped working, to which Siler answered that she would work from home. [ECF No. 1, ¶ 32(b)]. Third, "that, on a previous occasion, fire fighters and paramedics did not want to climb stairs to rescue an elderly resident who was unable to evacuate due to a fire." [ECF No. 1, ¶ 32(c)]. Fourth, "that the board did not have the funds to pay for modifications to make the building accessible" -- to which Siler responded that she would pay for any necessary modifications. [ECF No. 1, ¶ 32(d)]. Fifth, the Board member asked Siler "if she drove." [ECF No. 1, ¶ 32(e)].

The Board members then approved Siler's rental request, but on the condition

that she sign a liability waiver protecting Abbott House from any liability should she become injured. [ECF No. 1, ¶ 33]. Siler agreed, and she was to receive the waiver the next day. [ECF No. 1, ¶ 34]. Siler then received keys to the public areas, including a door that had a wheelchair ramp. *Id.*

Before Siler signed the waiver, however, Castro told her via email that the Board had denied her rental request because "the building has not the appropriate accessibility for people with disabilities [sic] conditions." [ECF Nos. 1, ¶¶ 35–37; 1-1]. The letter claimed that the building lacked accessible routes to the building's common areas, adequate accessible parking, and accommodating restrooms. [ECF Nos. 1, ¶ 38; 1-1]. Because of the denial, Siler incurred additional moving truck and hotel room expenses. [ECF No. 1, ¶ 39].

Siler hired an attorney, who sent a letter to Defendants advising them that they were violating the FHA. [ECF No. 1, ¶ 40]. Siler also took it upon herself, with the help of her family and assistant, to move into the condo regardless of the denial. [ECF No. 1, ¶ 41].

As she was moving in, Siler encountered an unnamed woman, who identified herself as someone who "used to be on, and continues to help, the Board of Directors." [ECF No. 1, ¶¶ 42, 44]. The woman said that Siler "could not move because there were not any [sic] protectors in the elevator," and the woman also took pictures of Siler's belongings and family. [ECF No. 1, ¶¶ 42–43].

Two days later, as Siler; her family; her assistant; and her service dog, Minty, were getting in the elevator, they encountered the second Board member who had conducted Siler's rental interview. [ECF No. 1, ¶ 45]. The Board member "shouted at them, saying that Minty could not be in the elevator," and prevented Siler's assistant from closing the elevator door. [ECF No. 1, ¶¶ 46–47]. Siler explained that Minty was her service animal, to which the Board member responded, "it did not matter." [ECF No. 1, ¶¶ 48–49].

The next day, Siler noticed that an automatic door opener for the ground floor entrance had been moved to a wall that Siler could not reach. [ECF No. 1, ¶ 50]. Siler also alleges that she "and her personal aide continue to be harassed regarding their use and enjoyment of the premises." [ECF No. 1, ¶ 51].

Approximately one month after these incidents, Abbott House, Inc.'s attorney sent a letter to Siler's attorney "apolog[izing] for any prior miscommunication regarding the approval of your client Ms. Siler as a tenant." [ECF Nos. 1, ¶ 52; 1-2]. The letter then says that "[t]he Board found no legal or factual basis for denial of your client, despite any prior communications." *Id.*

The letter next addresses Minty, saying that "it has been reported that your client has a large dog which frequently utilizes our building's elevator." [ECF No. 1-2]. The letter claims that the Condominium's By-Laws do not permit pets of more than 25 pounds and does not allow those pets to enter the elevator or lobby. [ECF Nos. 1, ¶ 53;

1-2]. The letter then proposes "a reasonable accommodation" to Siler: "the Board of Directors will permit Ms. Siler and her pet to utilize the building's elevator as long as the pet is wearing a leash." [ECF Nos. 1, ¶ 53; 1-2]. But "Siler's pet," the letter continues, "is not allowed in the elevator or lobby if the pet is being walked by any guest, assistant, agent or employee of Ms. Siler unless Ms. Siler is actually present in the elevator with them at the time." *Id.*

Siler alleges that "[t]here is no basis for such limitation of [her] use and enjoyment of the premises." [ECF No. 1, ¶ 53]. Siler also characterizes the restrictions proposed in the letter as nonsensical and as lacking any purpose or reason. [ECF No. 1, ¶ 68].

Siler further alleges that Defendants' actions caused her, and continue to cause her, "irreparable loss and injury," which includes "humiliation, embarrassment, emotional distress, and deprivation of her right to equal housing opportunities regardless of her disability." [ECF No. 1, ¶ 54]. Siler adds that she also suffered actual damages, including "unexpected and unnecessary moving truck and hotel rental fees." [ECF No. 1, ¶ 54].

Siler's Complaint alleges six counts. The first four counts raise claims under the FHA and its Florida equivalent for (1) denial of housing (Count I), (2) failure to reasonably accommodate (Count II), (3) discrimination in the terms and conditions of housing (Count III), and (4) retaliation (Count IV), although this last claim is only under

the FHA.[1] Siler's last two claims are for intentional interference with a contractual relationship (Count V) and with intentional interference with an advantageous business relationship (Count VI).

Under Counts I and II, apart from asking for damages, Siler requests declaratory and injunctive relief in the wherefore clauses. Specifically, she asks the Court to "declare that the actions of the Defendants violated the Fair Housing Amendments Act [] by discriminating against persons with disabilities" and to award her "injunctive relief to prohibit such discriminatory actions, and extensive training on the requirements of the fair housing act[.]" [ECF No. 1, pp. 8–10].

## II.    Standard

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the claim" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed. R. Civ. P. 8(a). Federal Rule of Civil Procedure 12(b)(6) provides defendants an opportunity to quickly dispose of complaints that fail to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

When considering a motion to dismiss under 12(b)(6), a court must take the factual allegations in the complaint as true and construe them in the light most

---

[1]    In their motion to dismiss, Defendants incorrectly say that Siler's retaliation claim is also under the Florida FHA. But the title to Count IV only references the "Federal Fair Housing Act," in contrast to the titles for Counts I through III, which mention both the federal and state law. Moreover, the body of Count IV cites only to 42 U.S.C. § 3617 and not to its Florida equivalent, Fla. Stat. § 760.37.

favorable to the plaintiffs. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

To survive a motion to dismiss, factual allegations must have "facial plausibility . . . that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Legal conclusions must be supported by 'enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Haese v. Celebrity Cruises, Inc.*, No. 12-20655-CIV, 2012 WL 3808596, at *2 (S.D. Fla. May 14, 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Therefore, an initial complaint is not required to prove the plaintiff's entire case, but should "'possess enough heft' to set forth 'a plausible entitlement to relief.'" *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007).

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). But a motion to strike is a "drastic remedy" that is "disfavored by the courts." *Williams v. Delray Auto Mall, Inc.*, 289 F.R.D. 697, 699 (S.D. Fla. 2013).

## III.     Analysis

### A.     *Count I: Denial of Dwelling*

Section 3604(f)(1)(A) of the FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter[.]" § 3604(f)(1)(A). Florida's FHA likewise makes it "unlawful to refuse to sell or rent after the making of a bona fide offer, to refuse to negotiate for the sale or rental of, or otherwise to make unavailable or deny a dwelling to any person because of . . . handicap[.]" § 760.23(1). Because the FHA and Florida FHA are "substantively identical," the same analysis applies to each. *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). Defendants argue that Siler does not allege that she was actually denied housing in violation of the FHA or Florida FHA. Rather, Defendants point to the allegations showing that the owner of the condo unit entered into a one-year lease with Siler; that the Board approved her rental request and gave her keys; and that, although the Board initially denied the rental, it later changed its mind, as shown in the letter by Abbott House, Inc.'s lawyer. Defendants also point out that Siler does not allege that they have tried to evict her.

Siler counters by citing *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213 (11th Cir. 2016), which she contends is a binding appellate case rejecting the same argument Defendants assert in their motion. In *Hunt*, a mother and her son, who had Down

Syndrome, were given notice to vacate their apartment after the son was accused of threatening the building's staff members and of stealing. *Id.* at 1219. But before the Hunts vacated, a new management company took over and allowed them to stay. *Id.* at 1220.

The Court held that even though the *old* management company did not successfully evict the Hunts, the denial-of-dwelling claim against it would nonetheless survive because the company "nevertheless made the Hunts' housing unavailable by refusing to renew their lease and directing them to vacate their apartment," and the change in management did not "alter the prior discriminatory conduct." *Id.* at 1224 (quoting *McDonald v. Verble*, 622 F.2d 1227, 1233 (6th Cir. 1980) (holding that FHA claim was still available to a black couple who were refused a home by white sellers even though the couple ultimately consummated the sale)). The Court further explained that the FHA has a liberal "remedial policy," and thus must be given a "broad and inclusive interpretation." *Id.* at 1223 (internal citations omitted).

Based on *Hunt*, Defendants' argument is not convincing. Siler alleges that her disability caused her to suffer discrimination from the moment she stepped foot in Abbott House. She claims that the building's Community Association Manager, Castro, who is a Casmat employee, was taken aback by her disability and then lied (or, at minimum, incorrectly represented) that the building's office was not accessible by elevator. [ECF No. 1, ¶¶ 25–27]. At Siler's meeting with the building's Board of

Directors, she was asked "inappropriate questions regarding the nature and extent" of her disability and then was dissuaded from living at Abbott House. [ECF No. 1, ¶¶ 28–32]. The Board approved her request only if she signed a liability waiver and then changed its mind, expressly declining her rental request because of her disability. [ECF Nos. 1, ¶¶ 33–38; 1-1]. When Siler moved into her condo regardless, she was harassed by a former Board member, who was still involved with the Board, and by a current Board member. [ECF No. 1, ¶¶ 42–49]. The next day, an automatic door opener for the ground floor entrance had been moved to another wall that Siler could not reach. [ECF No. 1, ¶ 50]. Siler further alleges that this harassment is ongoing. [ECF No. 1, ¶ 51]. These allegations suffice to state a cause of action for denial of dwelling. *See Hunt*, 814 F.3d at 1223.

Abbott House, Inc.'s contrite letter (allowing Siler to stay in her apartment) does not make *Hunt* materially different from or inapplicable to this case. The letter did not "alter the prior discriminatory conduct." *Hunt*, 814 F.3d at 1224. It certainly does not reimburse Siler for her alleged unexpected rental van and hotel expenses. [ECF No. 1, ¶ 54]. And Siler alleges that she *still* continues to suffer harassment and discrimination. [ECF No. 1, ¶¶ 51, 54].

Moreover, Defendants' argument runs contrary to the FHA's remedial policy. The Court is supposed to further the FHA's liberal "remedial policy" by giving it a "broad and inclusive interpretation." *Id.* at 1223. But if Defendants could immunize

prior discriminatory conduct by later having their lawyer send an apologetic retraction, then that would encourage discriminatory conduct and unduly narrow the scope of permissible claims.

In short, Siler has stated a cause of action for denial of a dwelling under the FHA and Florida FHA.

### B.    *Count II: Failure to Accommodate*

The FHA includes in its definition of discrimination "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" § 3604(f)(3)(B). The Florida FHA has a similar definition of discrimination. § 760.23(9)(b). A failure-to-accommodate claim has four elements: (1) the plaintiff is disabled within the meaning of the FHA;[2] (2) the plaintiff requested a reasonable accommodation; (3) the requested accommodation was necessary to afford the plaintiff an opportunity to use and enjoy the dwelling; and (4) the defendants refused to make the accommodation. *Bhogaita*, 765 F.3d at 1285.

Defendants argue that "there are no allegations that either Defendant has done anything other than to allow Siler full access to the property." [ECF No. 16, p. 6]. Defendants then go one step further, pointing to the letter by Abbott House, Inc.'s lawyer as proof that they reasonably accommodated Siler's use of Minty. Defendants

---

[2]        There is no dispute that Siler is, in fact, disabled within the meaning of the FHA.

further argue that there are no allegations that they have actually enforced the pet restrictions and that, even if they did enforce it, there are no allegations explaining how requiring Siler to "be in the presence of her service dog in [certain] areas adversely affects her use and enjoyment of the dwelling." *Id.*

Siler responds by citing to *Sabal Palm Condominiums of Pine Island Ridge Association, Inc. v. Fischer*, 6 F. Supp. 3d 1272, 1283 (S.D. Fla. 2014), which explains that a service dog is not subject to pet or size restrictions. Siler then argues that "there is no rationale to transform the assistance animal to a pet when Ms. Siler's assistant takes Minty for a walk to relieve himself, and thus require Minty and the assistant to walk down two flights of stairs when they are not with Ms. Siler." [ECF No. 18, p. 9]. Siler then cites to an April 2013 HUD Statement as standing for the proposition that "[a]ny limitation on the use of assistance animals, other than paying for the damages the animal causes, being in control of the animal, and picking up animal waste, may constitute an infringement of the person with a disability's equal use and enjoyment of the premises." [ECF No. 18, pp. 9–10].

In their reply, Defendants do not challenge the *Sabal* decision, adding that they "do not contend that they may establish a prohibition of having the dog in the elevator or in the common areas" and "do not contend that service pets remain subject to weight restrictions." [ECF No. 24, p. 3 n. 4]. But Defendants also do not back away from their presence restriction (i.e., that Siler must be with the dog in certain areas), calling it an

"accommodation." [ECF No. 24, p. 4]. Defendants then argue that "Siler does not allege that she ever objected to this accommodation . . . before she filed this suit." [ECF No. 24, p. 4]. Thus, Defendants conclude, Siler never actually requested an accommodation.

Defendants' argument is unpersuasive. Defendants are correct that "a plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA."*Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008). But although the Complaint does not allege that Siler explicitly requested an accommodation regarding Minty, one may imply such a request from the Complaint as a whole. Abbott House, Inc.'s own attorney proposed a "reasonable accommodation" from the condominium's pet restriction. [ECF No. 1-2]. That would presuppose that Abbott House, Inc. already knew that Siler sought an accommodation from the restriction, namely, that she could keep Minty without being subject to any weight or movement restrictions. At minimum, the use of the FHA buzz words makes it difficult for Abbott House, Inc. to argue that it was not on notice that Siler wanted an accommodation for Minty.

Moreover, the argument that Siler had to request a *second* accommodation from the first accommodation misapprehends the issue. Siler's position is that Defendants have failed to reasonably accommodate her use of a service dog by placing a restriction on Minty's use of the elevator or lobby when the dog is not in Siler's presence. Defendants' position is that they *have* reasonably accommodated Siler's use of a service

dog because no one else in the building would be allowed to even have a standard poodle. Therefore, Defendants say, it is entirely reasonable to, *as part of that accommodation*, require Siler to be with Minty when using the elevator. So Defendants may say, for example, that requiring Minty and someone else "to walk down two flights of stairs when they are not with Ms. Siler" [ECF No. 18, p. 9] is not an unreasonable compromise because it does not deprive Siler of her use and enjoyment of the property. *That* is the issue, and it is one that cannot be decided on a motion to dismiss.

Finally, contrary to Defendants' argument that Siler has not alleged that she suffered any adverse action, Siler alleges that she "and her assistant are continually harassed when using the service dog in the elevators and the common areas of the facility." [ECF No. 1, ¶ 66]. Siler also generally alleges that Defendants' actions caused her, and *continue* to cause her, various forms of harm. [ECF No. 1, ¶ 54]. These and similar allegations suffice to support Siler's claim that she suffered damages due to Defendants' failure to accommodate her.

Therefore, Siler has stated a cause of action for failure to accommodate under the FHA and Florida FHA.

### C.    *Count III: Discrimination in the Terms and Conditions of Housing*

Section 3604(f)(2)(A) of the FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a

handicap of . . . that person." § 3604(f)(2)(A). The Florida FHA provides the same relief. § 760.23(8). Stated differently, Siler must show that Defendants "placed conditions on [her] that were not imposed on other residents and restricted [her] access to facilities in the complex that were open to other residents." *Hunt*, 814 F.3d at 1224.

Defendants' terse, authority-free attack on Count III is inadequate to support an order dismissing the count. First, Defendants summarily reject Siler's allegations that, during her rental interview, she was improperly questioned about the nature and extent of her disability, because this "happened before she moved in." [ECF No. 16, p. 7]. While that is factually correct, it is legally irrelevant, because Siler had already signed a lease in the building. [ECF No. 1, ¶ 18]. Moreover, the interview was itself a condition of signing the lease [ECF No. 1, ¶ 20], so Siler is in fact alleging that she was discriminated against while trying to satisfy a condition of her rental, i.e., rental approval following an interview, which would otherwise be a "formality." [ECF No. 1, ¶¶ 21, 28–32]. Notably, the discrimination included the unique imposition of having to sign a liability waiver. [ECF No. 1, ¶ 33].

Second, Defendants argue that even if they had moved an access button to an area that Siler could not reach, that action "does not satisfy the requirements of the statute." [ECF No. 16, p. 7]. But there is little explanation and no authority to support that position. And, on its face, the button-relocation allegation tends to show that Siler was "restricted [] access to facilities in the complex that were open to other residents."

*Hunt*, 814 F.3d at 1224. In addition, Siler alleges that the button relocation came at the heels of her encounter with a Board member who "shouted" at her because of Minty and prevented Siler's assistant from closing an elevator door. [ECF No. 1, ¶¶ 46–47]. Thus, the button relocation seemingly stemmed from a negative reaction to Siler's disability and is related to her access to the building.

Third, Defendants dismissively treat Siler's allegations of her encounter with the Board member just discussed above as isolated, inconsequential, and unsanctioned. [ECF No. 16, p. 7]. The Court, however, cannot weigh the import of that event at the pleading stage. The Complaint need not prove Siler's entire case; it simply needs to set forth "a plausible entitlement to relief." *Fin. Sec. Assurance*, 500 F.3d at 1282. And to that end, Defendants do not explain how their characterization of Siler's allegation means that she fails to state a claim.

In short, Siler has stated a cause of action for discrimination in the terms and conditions of housing under the FHA and Florida FHA.

**D.    *Count IV: Retaliation***

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" its provisions. § 3617. Defendants argue that Siler's retaliation allegations do not show sufficiently "intentional and

18

severe" conduct. [ECF No. 16, p. 8]. Siler, on the other hand, disagrees that actionable retaliation has to be intentional or severe. Rather, relying on *Fernandez v. Orlando Housing Authority*, No. 615CV1341ORL40DAB, 2016 WL 2784989 (M.D. Fla. May 13, 2016), she submits that "there is only a requirement of a nexus between an adverse action and the assertion of the plaintiff's rights." [ECF No. 18, p. 12].

*Fernandez* explains that there are two types of retaliation claims. The first type of claim is "where the defendant engages in discriminatory conduct that is so severe, pervasive, egregious, or hostile as to have the effect of causing a protected person to abandon the exercise of his or her housing rights." *Id.* at *4 (internal quotations omitted). As examples, the *Fernandez* court points to cases involving racially-motivated fire bombing, cross burning, and sexual harassment. *Id.*

The second type of claim requires the plaintiff to show that "(1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Id.* at *5. For the second type of claim, "it is **not** necessary for the defendant's adverse action to be pervasive, severe, egregious, or hostile; it is sufficient for the plaintiff to show that the defendant retaliated against him because of his statutorily protected activity." *Id.* (emphasis supplied).

Addressing *Fernandez*, Defendants argue that Siler does not raise the second type of claim because she does not allege to have engaged in protected activity. But as

addressed previously, Siler **did** request an accommodation for her use of a service dog. A retaliation claim may lie where the actions are "in retaliation for the plaintiff's attempts to receive accommodations[.]" *Hopler v. Crystal Tower, Inc.*, No. 13-62465-CIV, 2014 WL 3894261, at *4 (S.D. Fla. June 20, 2014). At least one incident -- the access-button relocation incident -- occurred immediately after Siler had a run-in with a Board member about Minty. [ECF No. 1, ¶¶ 45–60]. And Siler also alleges that she has continued to suffer harassment upon exercising her FHA rights. [ECF No. 1, ¶¶ 53, 82]. Thus, viewed through a lens reflecting a light most favorable to Siler, the Complaint may be read as bringing the second type of retaliation claim.

Moreover, even assuming that Siler is bringing only the first type of retaliation claim, the Court would still not dismiss Count IV. There is an obvious difference in degree between, for instance, a fire bombing and being shouted at in an elevator, which raises doubts as to whether Siler could meet the severity requirement with the allegations as they stand. *See Solodar v. Old Port Cove Lake Point Tower Condo. Ass'n, Inc.*, No. 12-80040-CIV, 2012 WL 1570063, at *8 (S.D. Fla. May 2, 2012) (dismissing retaliation claim because the allegations did not match the "factual allegations of incidents far more egregious" that normally involve retaliation claims). But the Court ultimately cannot, at the pleading stage, weigh Siler's allegations and find them lacking in severity. At this point, "no evidence yet exists," *Hopler*, 2014 WL 3894261, at *4, and the Court will not presuppose what that evidence will show. But Siler surely states a retaliation

claim of the second type, which does not require an egregious action.

So, in sum, Siler has stated a cause of action for retaliation under the FHA.

**E.** *Counts V and VI: Intentional Interference Claims*

To state a claim for intentional interference with a *contractual* relationship, the plaintiff must allege: "(1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010). To state a claim for intentional interference with a *business* relationship, the plaintiff must allege: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Id.* Defendants' sole ground for dismissal of both Counts V and VI are that Siler does not allege that her lease agreement was breached.

Defendants, however, are only half right. Siler need not allege that an actual breach of contract occurred to state a claim for intentional interference with a *business* relationship. In fact, such a claim does not even need the existence of a contract. *Id.* She does, however, need to allege a breach to state a claim for intentional interference with a *contractual* relationship. *Id.* (explaining that although an actual breach of contract is

unnecessary to state an interference with a business relationship claim, for an interference with a contract claim, the defendant's alleged attempt to procure the contract's breach without actual success was not enough to survive dismissal).

Accordingly, the Court dismisses Count V without prejudice but does not dismiss Count VI.

### F. *Casmat's Individual Liability*

The FHA "allows for claims to be brought against individual Defendants." *Hous. Opportunities Project For Excellence, Inc. v. Key Colony No. 4 Condo. Assoc., Inc.*, 510 F. Supp. 2d 1003, 1013 (S.D. Fla. 2007). That includes property managers, who, even if acting within their course of employment, are liable for their "own unlawful conduct." *Id.* at 1014. For example, in *Key Colony*, the court found that the plaintiff stated an FHA claim against a property manager where it was alleged that the manager "personally implemented and enforced all of the discriminatory rules and regulations of [the condominium owner's association] with knowledge of the illegality of such rules." *Id.*

Defendants argue that Siler does not similarly allege that Casmat personally implemented or enforced any discriminatory rules or regulations. Rather, Defendants describe Casmat's role -- through its employee Castro -- as being a mere "conduit" of information. Defendants further argue that Siler does not allege *how* Casmat was involved in the specific wrongdoing underlying each individual FHA claim, meaning, how Casmat itself denied Siler housing, failed to accommodate Siler, or discriminated

against Siler in the terms and conditions of housing.

Beginning with Siler's denial-of-housing claim, Defendants' argument is not persuasive. Siler alleged that Castro, who works for Casmat, informed her that the Board had denied her rental request because of her disability. [ECF No. 1, ¶¶ 35–36]. That act of communicating the decision, even when purely ministerial in nature, is sufficient to state an FHA claim against a property manager. *See Beck v. Royale Harbour of N. Palm Beach Condo. Ass'n, Inc.*, No. 14-80611-CIV, 2014 WL 4782962, at *4 (S.D. Fla. Sept. 3, 2014) (finding that the plaintiffs stated a cause of action under the FHA against a property manager who simply drafted two letters to the plaintiffs communicating the property association's decision to deny a lease based on occupancy limits). To be sure, such acts, standing alone, may not survive summary judgment, but they do survive a motion to dismiss. *See Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc.*, 141 F. Supp. 3d 1321, 1328 (S.D. Fla. 2015) (finding that purely ministerial acts by a property manager "may be sufficient to survive a motion to dismiss under the 'plausibility standard' applied at the dismissal stage" but were "insufficient to establish liability at the summary judgment stage.").

Regarding Siler's other FHA claims, however, Defendants' argument does have merit. Siler's failure-to-accommodate claim concerns Minty, and Siler does not allege that Casmat personally implemented or enforced Abbott House's pet restrictions. Quite the opposite, Siler explicitly references Abbott House, Inc. in her failure-to-

accommodate allegations. [ECF No. 1, ¶¶ 67, 69]. Moreover, in contrast to the email denying Siler's rental request, the letter proposing an accommodation for Minty came not from Casmat, but from an attorney writing "on behalf of the Abbott House Condominium Board of Directors." [ECF No. 1-2].

Siler also does not allege how Casmat was personally involved in any questioning of Siler's condition. Instead, she alleges that this questioning was done by two Board members during her rental interview. [ECF No. 1, ¶ 29].[3] Likewise, Siler does not allege that Casmat was personally involved in relocating the access button to the ground floor entrance. In fact, when referencing the incident, Siler either does not identify the actor because she uses the passive voice (the button "had been moved") or used the vague and sweeping word "Defendant's" when identifying the actor ("Defendant's relocating the button"). [ECF No. 1, ¶¶ 50, 72, 82]. Similarly, Siler does not identify the "agents" who have supposedly surveilled and harassed her. [ECF No. 1, ¶ 82]. And as to the other specific incidents of harassment, Siler alleges that they were done by a Board member and a former Board member, not by Castro or any other

_____

[3]    In her reply, Siler says that "Castro was present during the association interrogation." [ECF No. 18, p. 15]. Assuming that this rhetorical flourish refers to the rental interview, the Complaint does not say that. Nor does the Complaint say that "Castro was the agent who managed the day to day operations of the association" -- or explain how that fact would mean that Casmat was personally involved in discriminatory conduct. *Id.* Either way, Siler "cannot amend the complaint in her brief in opposition to a motion to dismiss." *Dykstra v. Fla. Foreclosure Attorneys, PLLC*, No. 9:15-CV-80006, 2015 WL 631026, at *2 n. 1 (S.D. Fla. Feb. 12, 2015).

Casmat employee. [ECF No. 1, ¶¶ 42–49].

To be sure, before discovery, Siler may not "know exactly what person was responsible for a discriminatory act." [ECF No. 18, p. 15]. But that does not excuse Siler from having to satisfy the minimum pleading standard for holding Casmat personally liable, a standard that is not difficult to meet in the first place. *See Key Colony*, 510 F. Supp. 2d at 1013. But of course, Siler should keep in mind that any allegations must be made in good faith and without violating Rule 11.

In conclusion, the Court will not dismiss Casmat from Count I but will dismiss Casmat without prejudice from Counts II through IV.[4]

### G.     *Requests for Injunctive Relief and Declaratory Relief*

Defendants raise several arguments in their bid to strike Siler's requests for injunctive and declaratory relief. Beginning with the injunctive relief, they first argue that Siler has no standing to compel Defendants to attend "FHA training" because she has not alleged to have suffered an "injury in fact" due to the alleged lack of training. [ECF No. 16, pp. 15–16]. Second, they argue that Siler cannot compel Defendants to

---

[4]     Defendants also argue that the intentional interference claims (Counts V and VI) should be dismissed in their entirety because they are not directed at Casmat. [ECF No. 16, p. 14]. Defendants are correct that those counts are only against Abbott House, Inc. -- a fact made obvious by the allegations and the wherefore clauses, which only mention Abbott House, Inc. [ECF No. 1, pp. 13–14]. But the Court cannot agree now that this results in a dismissal of the claims against *all parties*, and thus denies the motion to dismiss in that regard. And to the extent Defendants are instead asking the Court to dismiss Casmat from those counts, Casmat is not in those counts to begin with, so the request is illusory and illogical.

comply with the FHA because "injunctions compelling compliance with the law are not actionable." [ECF No. 16, p. 16]. Third, they argue that Siler cannot compel Defendants to not discriminate against persons with disabilities because that "is the same thing as ordering the Defendants to obey the law." *Id.* Fourth, they argue that Siler's requested injunctive relief, as phrased, violates Federal Rule of Civil Procedure 65 because "it is not limited to the specific type of discrimination that is alleged by Siler." *Id.*

Concerning the declaratory relief, Defendants first argue that Siler did not file an "appropriate pleading" seeking a declaration, but improperly "tucked a simple request into her 'Wherefore' clause." [ECF No. 16, p. 17]. Second, they argue that a declaration saying that Defendants violated the FHA, as opposed to one declaring any rights or relationships between the parties, falls outside the scope of the Declaratory Judgment Act. Defendants further add that a determination of wrongdoing would be made regardless at the time the FHA claims are addressed on the merits.

In her opposition response, Siler submits that she is "entitled to both damages and injunctive relief." [ECF No. 18, p. 16]. Siler, however, does not specifically address each of Defendants' arguments and does not address at all the issue of declaratory relief. Rather, Siler sets forth several *general* propositions of law concerning the FHA and injunctive relief, which include the following: (1) the FHA provides for injunctive relief; (2) courts have broad and flexible equitable powers to fashion appropriate remedies to prevent present and future discrimination, including injunctions; (3) an

FHA violation creates a presumption of irreparable harm and future harm; (4) injunctive relief is appropriate when a party violates the law unless the party meets a "heavy burden" of demonstrating that "there is no reasonable expectation that the wrong will be repeated;" and (5) "[i]njunctive relief that has been ordered in Fair Housing cases include annual fair housing training, posting non-discriminatory policies and procedures, maintaining records of compliance, and affirmative advertising." [ECF No. 18, pp. 16–18].

Addressing Siler's request for injunctive relief first, section 3613(c)(1) of the FHA provides, in pertinent part, that "if the court finds that a discriminatory housing practice has occurred or is about to occur," then the court may issue "any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." § 3613(c)(1). The Florida FHA provides the same types of relief. § 760.35(2). "The purpose of such injunctive relief is to ensure that the FHA is not violated in the future and to remove any lingering effects of past discrimination." *Fair Hous. Ctr. of Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc.,* 164 F. Supp. 3d 1375, 1389 (S.D. Fla. 2016).

Defendants are correct that Siler cannot seek an injunction that simply compels them to obey the law. *See United States v. Hialeah Hous. Auth.,* No. 08-22679-CIV, 2009 WL 10668945, at *4 (S.D. Fla. May 26, 2009) (dismissing injunction claim that sought to

enjoin the defendant "from discriminating because of disability in violation of the Fair Housing Act," because "[t]he Eleventh Circuit has held repeatedly that injunctions that simply require compliance with the law are impermissible.") (citing *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (holding that "[i]t is well-established in this circuit that an injunction demanding that a party do nothing more specific than 'obey the law' is impermissible.")). But there is a difference between trying to enjoin a defendant to "obey the law" and trying to enjoin the defendant to stop discriminating against the plaintiff, which is a permissible form of relief. *See Hous. Opportunities Project for Excellence, Inc. v. Wedgewood Condo. Ass'n, Inc.*, No. 12-60172-CIV, 2012 WL 4193969, at *10 (S.D. Fla. Sept. 19, 2012) (denying motion to dismiss injunctive relief within two FHA claims that sought to "enjoin the Defendants from discriminating against resident Plaintiffs based upon familial status and from retaliating against Plaintiffs for their participation in this suit."); *see also* § 3613(c)(1).

Siler's requested injunction is so broadly phrased that it falls within the impermissible camp. Siler requests a declaration that "Defendants violated the Fair Housing Amendments Act [] by **discriminating against persons with disabilities**" and then asks for "injunctive relief to prohibit **such discriminatory actions**, and extensive training on the requirements of the fair housing act[.]" [ECF No. 1, pp. 8–10 (emphasis added)]. Without specifically addressing Siler or any particular discriminatory acts or limiting the requests in any other meaningful way, the request's breadth is akin to

asking for an order forcing Defendants to "obey the law." Siler's requested injunction, as phrased, is thus improper.

Concerning Siler's request for declaratory relief, Siler has failed to allege facts that "show a substantial and continuing controversy that is real and immediate and creates a definite, rather than speculative threat of injury." *Hialeah Hous. Auth.*, 2009 WL 10668945, at *4 (dismissing request for declaratory relief in FHA case where "[t]here are no facts alleged to demonstrate that beyond the circumstances surrounding the eviction of [a family] that there is an immediate, definite future threat of injury to Plaintiff."). Specifically, although Siler has generally alleged that she continues to suffer harm, those vague and broad allegations are not enough.

Therefore, the Court strikes without prejudice Siler's requests for injunctive relief and for declaratory relief. Siler may re-allege her requests in an Amended Complaint, assuming she can do so in good faith and without violating Rule 11. Given these rulings, the Court need not address Defendants' other arguments.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on November 16, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record